JONATHAN MANES (IL Bar No. 6340642)*
JESSICA GINGOLD (IL Bar No. 6329992)*
CHISATO KIMURA(IL Bar No. 6353191)*
Jonathan.Manes@macarthurjustice.org
Jessica.Gingold@macarthurjustice.org
Chisato.Kimura@macarthurjustice.org
MACARTHUR JUSTICE CENTER
160 E. Grand Avenue
Chicago, IL 60611
Telephone: (312) 503-0012

SCARLET KIM (NY Bar No. 5025952)*
KEN SEXAUER (CA Bar No. 327964)
scarletk@aclu.org
ksexauer@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500

JACOB SNOW (CA Bar No. 270988)
jsnow@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Pro Hac Vice application forthcoming

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES FOUNDATION; and AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES CUSTOMS AND BORDER PROTECTION, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, and DEPARTMENT OF HOMELAND SECURITY, <br><br> *Defendants*. | Case No._____ <br><br> **COMPLAINT** |

**INTRODUCTION**

1. This action under the Freedom of Information Act ("FOIA") seeks to compel the U.S. Department of Homeland Security ("DHS") and three of its component agencies, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and U.S. Citizenship and Immigration Services ("USCIS"), to release records regarding its policies and practices of threatening, surveilling, prosecuting, and otherwise taking action against people who photograph, film, or publish footage of immigration enforcement happening on the streets.

2. The Defendant agencies have escalated immigration raids in cities and states across the country, and, at the same time, they have engaged in an alarming pattern of targeting and retaliating against individuals who document that activity and share it with the public.

3. DHS agents have attempted to stifle photography, recording, and publication by making threats of arrest, by pointing loaded firearms, and by assaulting, detaining, and arresting individuals who are documenting their activities.

4. DHS agents have also taken more elaborate steps to target people who document their activity. Defendant agencies are collecting and maintaining records about people who photograph and film immigration agents. DHS agents have traced the addresses of people who were recording and then showed up uninvited in front of their homes in blatant acts of intimidation. Defendant agencies are even misusing administrative subpoenas to force social media companies to disclose private information about people documenting or publishing information about immigration enforcement actions.

5. When DHS agents target people who document law enforcement activities, they threaten a fundamental constitutional freedom. The First Amendment protects the right to create, publish, and disseminate recordings and photographs of government officials doing their work in public view. Defendants' conduct chills the exercise of that First Amendment right.

6. Footage of law enforcement abusing its power has been an essential form of speech and democratic accountability since at least the civil rights era. Video and photographs of Bull Connor's forces brutalizing civil rights protestors in Birmingham with firehoses and police dogs are seared in the nation's memory, as are images of Alabama state troopers trampling and beating the peaceful men and women who marched across the Edmund Pettus Bridge. Video of police officers brutalizing Rodney King

COMPLAINT                                        2                                    Case No._____

in 1991 and murdering George Floyd in 2020 prompted national reckonings with police violence.

7. The same is true in the current moment. Footage of DHS agents killing Renee Good and Alex Pretti galvanized the public, as have countless other videos of DHS agents abusing their power and mistreating people in American cities and states. Recordings have also been essential to show that the government has frequently misled the public about its agents' actions. Footage and photos have often been essential to track and provide legal support to people whisked away and held incommunicado at DHS detention facilities.

8. Footage of enforcement actions has thus been critical to accomplishing core purposes of the First Amendment: the free discussion of government affairs, exposure of government misconduct, public accountability, and democratic pressure to change course.

9. Despite these constitutional protections, DHS has publicly attacked recording and dissemination of footage showing its agents' public activities, instilling a climate of fear around recording and reporting on DHS enforcement actions. The Secretary of Homeland Security and other high officials have asserted publicly that the government considers the recording of immigration agents to constitute "violence," "doxing," and harassment. These statements are echoed on the ground by the widely reported DHS practices aimed at stifling journalists, bystanders, and others who photograph and record immigration enforcement actions.

10. Plaintiffs submitted a FOIA request ("Request") seeking records about DHS agencies' policies and practices toward individuals who photograph, record, and publish video or images of immigration enforcement actions, including what criminal statutes they believe may prohibit such activities; the agencies' interpretation of First Amendment protections for individuals who record and publish; and when the agencies believe physical force, arrest, detention, surveillance, tracking, subpoenas, or other tactics are appropriate responses.

11. DHS, ICE, CBP, and USCIS have failed to respond to Plaintiffs' Request within the deadlines prescribed by FOIA. Plaintiffs sue to enforce their Request and inform the public about the Government's policies and practices regarding people who document its agents' enforcement actions.

## JURISDICTION

12. This Court has subject matter jurisdiction over this action and personal jurisdiction over

the parties pursuant to 5 U.S.C. § 552(a)(4)(A)(vii), (a)(4)(B), (a)(6)(E)(iii).

13.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346 and 5 U.S.C. §§ 701–706.

## VENUE AND INTRADISTRICT ASSIGNMENT

14.    Venue lies in the Northern District of California pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e)(1) because it is the district in which Plaintiff American Civil Liberties Union of Northern California ("ACLU NorCal") has its principal place of business.

15.    Pursuant to Civil Local Rule 3-2(c) and (d), assignment to the San Francisco division is proper because Plaintiff ACLU NorCal is headquartered in San Francisco.

## PARTIES

16.    Plaintiff American Civil Liberties Union ("ACLU") is a non-profit 26 U.S.C. § 501(c)(4) corporation incorporated in New York State and with its principal place of business in New York, New York. The ACLU defends the civil rights and civil liberties of all people throughout the United States and its jurisdictions and is committed to ensuring that the U.S. government complies with the Constitution and laws of this country. The ACLU is committed to protecting and empowering vulnerable and marginalized people and communities. It is also committed to transparency and accountability in government and seeks to ensure that the public is informed about the conduct of its government in matters that affect civil liberties. Obtaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and the public is a critical and substantial component of the ACLU's work.

17.    Plaintiff American Civil Liberties Union Foundation ("ACLUF") is a separate 26 U.S.C. § 501(c)(3) organization incorporated in New York State and with its principal place of business in New York, New York. The ACLUF educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties.

18.    Plaintiff ACLU NorCal is a non-profit organization and an affiliate of the national American Civil Liberties Union. ACLU NorCal is established under the laws of the state of California and is headquartered in San Francisco, California. ACLU NorCal is committed to government transparency and accountability and seeks to ensure that the American public is informed about the

COMPLAINT                                    4                            Case No._____

conduct of its government in matters that impact civil liberties and human rights. In support of its mission, ACLU NorCal uses its communications department to disseminate to the public information relating to its mission, through its website, newsletters, in-depth reports, and other publications.

19.    Defendant ICE is a component of DHS and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

20.    Defendant CBP is a component of DHS and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

21.    Defendant USCIS is a component of DHS and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

22.    Defendant DHS is an agency within the meaning of 5 U.S.C. § 552(f)(1) and includes among its component agencies ICE, CBP, USCIS, and the Federal Protective Service ("FPS").

## FACTUAL BACKGROUND

### A.    THE TRUMP ADMINISTRATION'S MASS IMMIGRATION ENFORCEMENT OPERATIONS

23.    The Trump administration has rapidly expanded immigration enforcement operations across the country since taking office in January 2025. The White House has set targets for daily immigration arrests that amount to over a million arrests per year. DHS's operations go far beyond targeting immigrants with criminal histories.

24.    On January 20, 2025, the acting secretary for DHS issued a memorandum to ICE, entitled *Enforcement Actions in or Near Protected Areas*, which rescinded a longstanding policy that protected "sensitive locations" and signaled to officers that they could target schools, places of worship, hospitals, courthouses, and similar sites. Across the country, armed federal agents in combat gear are swarming these locations as well as residential neighborhoods and workplaces.

25.    As they expand patrols and arrests nationwide, immigration agents are often wearing masks to obscure their faces and refusing to provide their names, badge numbers, or even to identify the agency to which they belong.

26.    The administration has conducted enforcement "surges" in numerous cities and states across the country, deploying hundreds or thousands of agents who have descended en masse and used extraordinarily aggressive tactics. Federal agents are increasingly using force, including deadly force,

against both bystanders and targets of immigration enforcement operations. On September 12, 2025, an ICE agent shot and killed Silverio Villegas Gonzalez while standing alongside Mr. Villegas' vehicle in Franklin Park, Illinois. On October 4, 2025, a Border Patrol agent shot Marimar Martinez five times in Chicago. On January 7, 2026, another ICE agent shot and killed Renee Good observing an immigration raid in Minneapolis. On January 8, 2026, CBP agents shot and injured two people in Portland, Oregon. On January 24, 2026, an ICE agent shot and killed Alex Pretti who had been directing traffic and filming near an enforcement action. Since September 2025, immigration officers have fired on at least seventeen people in nine states.

27.    DHS has vastly expanded the number of immigration agents nationwide, supported by a $75 billion budget appropriation that supplements ICE's annual appropriation of $10 billion. In 2025, ICE more than doubled the number of its officers and agents from 10,000 to 22,000.

28.    The expanding presence of federal immigration agents across the United States is a matter of significant public concern for U.S. citizens and non-citizens alike, many of whom now encounter these agents on a daily basis. Throughout the chaos of these immigration raids, it is typical for loved ones, bystanders, legal observers, and journalists to film or photograph the frightening scenes.

29.    Many Americans have now seen videos of masked agents swarming individuals as they walk down the sidewalk, leave courtrooms, drive to work, or accompany their children to school. The videos show agents aggressively arresting people and forcing them into unmarked vans or SUVs. Some of these videos document unlawful and disturbing actions by ICE officers, including the unprovoked use of pepper spray and tear gas, the shattering of car windows, and the arrest of parents, leaving young children unaccompanied, crying, and screaming.

30.    People who have witnessed raids, street arrests, and other actions by immigration agents have shared their experiences by publishing photos and videos documenting the violence and fear that often accompany such activity.

31.    In a number of instances, video footage of incidents has directly contradicted DHS's official account of what transpired and demonstrated that senior White House and DHS officials have attempted to mislead the American public. For example, footage of Silverio Villegas Gonzalez contradicted false DHS statements that he drove his car at ICE agents and that an agent was seriously

injured before shooting Mr. Villegas. Footage of Alex Pretti contradicted false statements that he was a domestic terrorist out to massacre law enforcement.

32.    Even DHS itself has recognized the power and value of video footage. It has sent professional camera crews to accompany and document high-profile immigration raids and then turned the footage into slickly-produced video reels posted to its official accounts.

**B.    DHS'S POLICY, PATTERN, AND PRACTICE OF RETALIATING AGAINST INDIVIDUALS RECORDING IMMIGRATION ENFORCEMENT ACTIVITY**

33.    On June 14, 2025, following a surge of DHS agents to Los Angeles, DHS issued an internal bulletin titled, "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Unrest." The bulletin identified use of cameras, "note taking," "livestreaming" law enforcement officers, and posting videos on social media as examples of "suspicious activity," "unlawful civil unrest" tactics, or "threats."[1]

34.    On July 12, 2025, at a DHS press conference, then-DHS Secretary Kristi Noem stated that "violence" includes "anything that threatens [DHS agents] and their safety. So it is doxing them. It's videotaping them where they're at."[2]

35.    On September 9, 2025, the DHS Assistant Secretary for Public Affairs told reporters that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents . . . We will prosecute those who illegally harass ICE agents to the fullest extent of the law."[3]

36.    On December 22, 2025, a statement by the DHS Office of Public Affairs was published in response to a reporter's question asking if the Department considered following or recording a federal law enforcement officer to be obstruction of justice. An unnamed spokesperson stated over email: "That sure sounds like obstruction of justice. . . . If you obstruct or assault our law enforcement, we will hunt you down and you will be prosecuted to the fullest extent of the law."[4]

37.    On January 23, 2026, independent journalist Ken Klippenstein reported that DHS has

---

[1] Ex. A to Decl. of Ryan Shapiro in Supp. of Pls.' Prelim. Inj., *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025) (No. 25-cv-5563), Dkt. No. 34-19, *appeal docketed*, No. 25-5975 (9th Cir. Sept. 23, 2025).

[2] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, YouTube (July 14, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8.

[3] Matthew Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents is "Violence"*, Ctr. for Media & Democracy (Sept. 9, 2025), https://perma.cc/ZYU9-FAP6.

[4] C.J. Ciaramella, *DHS Says Recording or Following Law Enforcement 'Sure Sounds Like Obstruction of Justice'*, Reason (Dec. 22, 2025), https://perma.cc/XC3J-2KQ9.

---

COMPLAINT                                          7                                    Case No._____

"ordered immigration officers to gather identifying information about anyone filming them" and, in the words of one federal official, to "send that information to Intel who will do a 'work-up' on them." The official further explained that the work-up entails "trying to identify them via social media, running their license plates if available, and running a criminal history check."[5]

38.    A few days later, Klippenstein reported on the existence of a "patchwork system" of "more than a dozen secret and obscure watchlists" that Defendant DHS and the Federal Bureau of Investigation are using to track individuals they perceive as protesting issues including federal immigration enforcement. Klippenstein reported that a senior government official, who confirmed the existence of the watchlists, stated that these lists, which can comprise "this social media post, that video taken of someone videoing ICE, the mere attendance at a protest . . . eventually just become[] . . . list[s] . . . of criminality, with the cops thinking that indeed they are dealing with criminals and terrorists." Klippenstein further reported that these watchlists are used "to organize . . . information in possession of the federal government" including to "process tips, situation reports and collected photographs and video submitted by both the public and from agents in the field" to "create a 'common operating picture'" to "allow task forces to target individuals for surveillance and arrest."[6]

39.    On January 27, 2026, it was reported that DHS sent a memorandum to agents assigned to Minnesota asking them to "capture all images, license plates, identifications, and general information on hotels, agitators, protestors, etc., so we can capture it all in one consolidated form."[7]

40.    On January 31, 2026, in response to a press request for an official statement, the DHS Assistant Secretary for Public Affairs stated that "videoing our officers in an effort to dox them and reveal their identities [] is a federal crime and a felony."[8]

41.    On February 10, 2026, Reuters reported that ICE officials confirmed that "ICE has been tracking the names of protesters in an internal database for several months" and that this database

---

[5] Ken Klippenstein, *ICE Making List of Anyone Who Films Them*, Substack (Jan. 23, 2026), https://perma.cc/7N2Z-XUMT.
[6] Ken Klippenstein, *Exclusive: ICE's Secret Watchlists of Americans*, Substack (Jan. 28, 2026), https://perma.cc/9MH9-3SJT.
[7] Jeff Winter & Priscilla Alvarez, *Alex Pretti Broke Rib in Confrontation With Federal Agents a Week Before Death, Sources Say*, CNN (Jan. 27, 2026), https://www.cnn.com/2026/01/27/us/alex-pretti-protesters-minneapolis-invs.
[8] Matt Burgess et al., *How to Film ICE*, WIRED (Jan. 31, 2026), https://perma.cc/BN8F-VCVA.

contains information including individuals' "names, photos, actions that provoked suspicion, locations."[9]

42.    Consistent with the above, DHS agents are engaged in an ongoing nationwide pattern and practice of retaliating against those who record and publicize information about immigration raids and arrests.

43.    Agents have threatened lethal force and pointed guns at peaceful observers documenting their activities. For example:

a.    On June 14, 2025, in Downey, California, DHS agents pointed a gun at a church pastor who was attempting to film an arrest in her church parking lot.[10]

b.    On June 17, 2025, in Pasadena, California, a federal agent drove through the parking lot of the shopping plaza where community members had gathered in response to an immigration raid. When a man went up to the car to photograph the license plate, a masked federal agent pulled a gun on him.[11]

c.    On June 19, 2025, in Santa Ana, California, a person driving by an immigration raid rolled down their window and began to record video of the arrests. A masked federal agent raised a handgun and pointed it at the driver, while another agent yelled, "You better get out of here."[12]

d.    On October 10, 2025, in Chicago, Illinois, two federal vehicles blocked a woman's car on her street after she had stopped to record them. Agents then surrounded her car, banged on her windows, and tried to open her car doors, demanding that she get out. One agent stood in front of her car and aimed a long gun at her head. An agent told her "We'll let you go this time, but next

---

[9] Ted Hesson, Kristina Cooke & Brad Heath, *ICE Is Cracking Down on People Who Follow Them in Their Cars*, Reuters (Feb. 10, 2026), https://perma.cc/KEL7-QJXJ.
[10] First Am. Compl. ¶ 100(a), *L.A. Press Club v. Noem*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025) (No. 25-cv-5563), Dkt. No. 67.
[11] *Id.* ¶ 100(b).
[12] *Id.* ¶ 100(d).

time you'll be detained."[13]

    e.    On December 7, 2025, in Minneapolis, Minnesota, a married couple who observed ICE agents at their church, followed an ICE vehicle in their car into a parking lot. They were immediately boxed in and surrounded by four ICE vehicles. Masked ICE agents pointed semiautomatic weapons at them in close range, demanded they roll down their windows, and threatened them multiple times with arrest. They wanted to record the events with their cell phone cameras but were too terrified to do so.[14]

    f.    On December 8, 2025, Augsburg University President Paul Pribbenow reported that DHS agents arrested an Augsburg University student on the Augsburg campus without a warrant to enter the property. While agents were arresting the individual, they aimed weapons at and threatened students and staff who had gathered to observe and document DHS's warrantless arrest.[15]

44.    DHS agents have threatened to deploy and have deployed tear gas and pepper balls at peaceful observers documenting their activities, at times enveloping bystanders and children in clouds of dangerous chemical agents. For example:

    a.    On June 20, 2025, in Pico Rivera, California, federal agents fired tear gas at about half a dozen people videorecording and observing a DHS arrest.[16]

    b.    On June 23, 2025, in Marina Del Rey, California, federal agents fired at least two rounds of tear gas toward a group of community members that had been videorecording the agents arrest a woman.[17]

    c.    On August 28, 2025, in Westlake, California, DHS threw tear gas canisters

---

[13] Decl. of Jo-Elle Munchak, *Chi. Headline Club v. Noem*, 810 F. Supp. 3d 842 (N.D. Ill. 2025) (No. 25-cv-12173), Dkt. No. 77-1, *vacated and appeal dismissed*, No. 25-3023 (7th Cir. Mar. 5, 2026).

[14] Decl. of John P. Biestman, *Tincher v. Mullin*, No. 25-cv-4669 (D. Minn. filed Dec. 17, 2025), Dkt. No. 1-2; Decl. of Janet Lee, *Tincher*, No. 25-cv-4669 (D. Minn. filed Dec. 17, 2025), Dkt. No. 1-3.

[15] Nina Moini & Ngoc Bui, *Augsburg University President: ICE 'Illegally' Detained Student, Didn't Show Warrant*, Minn. Pub. Radio News (Dec. 8, 2025), https://perma.cc/JWX9-NKAN.

[16] First Am. Compl. ¶ 100(e), *L.A. Press Club*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025) (No. 25-cv-5563).

[17] *Id.* ¶ 100(f).

and shot pepper balls at community members who were videorecording them during an immigration raid.[18]

    d.    On October 30, 2025, in Gurnee, Illinois, a federal agent threatened to pepper spray a pastor who was recording the agents detaining two men outside a high school.[19]

    e.    On January 16, 2026, in Minneapolis, an ICE agent pointed his gun at a Minnesota resident who was documenting immigration enforcement, and said "I will shoot you." Minutes later, ICE agents blocked his vehicle and shot 10 rounds of pepper balls at his car.[20]

45.    Agents have tackled peaceful observers documenting their activities and dragged them from their cars, before arresting and detaining them. For example:

    a.    On June 19, 2025, in Hollywood, California, DHS agents tackled a man who was videorecording them. The agents then arrested him and held him in detention for more than twenty-four hours.[21]

    b.    On December 9, 2025, in Minneapolis, federal agents violently pulled to the ground and arrested a woman who was observing federal agents. Agents then detained her for over five hours, during which time they put her in shackles and cut off her wedding ring.[22]

    c.    On January 29, 2026, a St. Peter, Minnesota resident was following DHS vehicles and documenting their enforcement activity when a DHS vehicle dangerously cut her off in the middle of traffic. DHS agents emerged from the vehicle and immediately drew their firearms and pointed them at the resident. The agents approached her vehicle and demanded she get out.

---

[18] *Id.* ¶ 100(k).

[19] Decl. of Pastor Benjamin Squires, *Chi. Headline Club*, 810 F. Supp. 3d 842 (No. 25-cv-12173), Dkt. No. 190-9.

[20] Decl. of Jeremias Salazar-Fayant, *Tincher*, No. 25-cv-4669 (D. Minn. filed Feb. 13, 2026), Dkt. No. 136-66.

[21] First Am. Compl. ¶ 100(c), *L.A. Press Club*, 799 F. Supp. 3d 1036 (C.D. Cal. 2025) (No. 25-cv-5563).

[22] *See* Decl. of Susan Tincher, *Tincher*, No. 25-cv-4669 (D. Minn. filed Dec. 17, 2025), Dkt. No. 1-1.

When she refused, they opened her door and dragged her out. As the DHS agents were transporting her to detention, the St. Peter Chief of Police interceded and ended the arrest.[23]

46.    DHS agents are not just threatening and using violent force against peaceful observers documenting their activities. They are also engaged in heightened surveillance and tracking of those individuals. For example:

a.    On January 3, 2026, Minnesota State Representative Brad Tabke and his wife observed and gathered information about federal agents as they conducted an operation at a local apartment complex. Federal agents blocked them in the apartment parking lot and appeared to take down their license plate information. Later, as Tabke left the parking lot behind a vehicle with federal agents, the vehicle led him to his home and took pictures of his home. Records reviewed by the *Minnesota Star Tribune* reveal that federal agents ran Tabke's license plate number earlier that day. Tabke has said that he has seen federal agents outside his home at least a half dozen times.[24]

b.    On January 10, 2026, a Minnesota resident was stopped by a federal agent while observing and gathering information about immigration enforcement activity. The agent addressed her by name and told her that they had "facial recognition" and that his body cam was recording. Three days later, she received an email notice that her Global Entry/TSA Pre-Check privilege had been revoked.[25]

---

[23] Hannah Yang, Matt Sepic & David Schaper, *St. Peter Police Chief Intervened and Got Federal Agents to Release Resident, Sources Say*, Minn. Pub. Radio News (Jan. 31, 2026), https://www.mprnews.org/story/2026/01/30/st-peter-police-chief-intervenes-prevents-federal-agents-from-arresting-resident.

[24] Alison Kite, *Minnesota Democrats Report Being Followed, Harassed by ICE Agents During Immigration Surge*, Minn. Star Trib. (Mar. 25, 2026), https://perma.cc/M4S7-D55M.

[25] Decl. of Nicole Cleland, *Tincher*, No. 25-cv-4669 (D. Minn. filed Jan. 21,2026), Dkt. No. 98.

c.     On January 21, 2026, a Maine resident was recording federal agents in a parking lot when one of the agents took a picture of her, her vehicle, and her license plate. The agent said to her, "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." Two days later, another Maine resident was recording federal agents in a parking lot when agents photographed or filmed her and her license plate. When she asked the agents why they were taking her information, one of them responded, "Cause we have a nice little database. And now you're considered a domestic terrorist, so have fun with that."[26]

d.     On January 26, 2026, a Minnesota resident observed and gathered information about federal agents in a parking lot. When one of the vehicles with federal agents drove out of the lot, she continued to observe and gather information by following it. The vehicle with federal agents pulled into another parking lot and suddenly stopped. A federal agent leaned out of the vehicle and photographed the resident and later taunted, "Emily, Emily, we're going to take you home." The agent repeated the resident's name several times and stated the resident's home address.[27]

e.     On multiple occasions, including on February 5, 2026, and on February 25, 2026, a Memphis resident has had unmarked vehicles with federal agents sitting outside his home, following numerous incidents where agents have photographed or filmed him while he was recording immigration enforcement actions from a safe distance.[28]

---

[26] First Am. Class Action Compl. for Declaratory and Injunctive Relief ¶¶ 35, 40–47, 56–58, 63–69, *Hilton v. Mullin*, No. 26-cv-00092 (D. Me. filed Apr. 27, 2026), Dkt. No. 29; *see also* Decl. of Elinor Hilton in Supp. of Pls.' Mot. for a TRO ¶¶ 19-23, *Hilton*, No. 26-cv-00092 (D. Me. filed Feb. 23, 2026), Dkt. No. 3-1.

[27] Decl. of Emily Beltz, *Tincher*, No. 25-cv-4669 (D. Minn. filed Feb. 13, 2026), Dkt. No. 140.

[28] Decl. of Kenneth Halt, *Demster v. Blanche*, No. 26-cv-2546 (W.D. Tenn. filed May 28, 2026), Dkt. No. 16-51.

47.     DHS also appears to be pursuing investigations into a number of social media accounts that report on ICE activity and publish videos of immigration agents. For example, in September 2025, a federal judge temporarily blocked Meta from responding to a DHS administrative subpoena seeking information about Instagram accounts that identified an agent involved in immigration raids.[29] In October 2025, another federal judge again temporarily blocked Meta from responding to a different DHS administrative subpoena seeking information about social media accounts that report on local ICE activity in Montgomery County, Pennsylvania. In both cases, DHS eventually withdrew the administrative subpoena.[30]

48.     The Trump administration has also attacked the distribution of information about immigration enforcement activity. For example:

a.     On October 2, 2025, then-Attorney General Pam Bondi stated that the administration had demanded that Apple remove ICEBlock from its App Store. ICEBlock is an app that facilitates sharing information about immigration enforcement activity. Bondi also publicly threatened to prosecute the creator of ICEBlock.[31]

b.     On October 14, 2025, Bondi stated that the administration had also demanded that Facebook remove a group page called "ICE Sightings – Chicagoland." The page was created by a Chicago resident so community members could share information about federal agents and their activities in Chicago. By October 2025, the group had nearly 100,000 members, with members publishing thousands of posts and comments per day, including photos and videos of enforcement activity. Group moderators instructed members not to post anything threatening, hateful, or that promoted

[29] Order re: Mot. to Quash, *In re Subpoena No. FY25-ELC-0105, Doe v. U.S. Dep't of Homeland Sec.*, No. 3:25-mc-80286-TSH (N.D. Cal. filed Sept. 19, 2025), Dkt. No. 4 (ordering Meta not to produce information pending further order of the Court).

[30] Stipulation of Dismissal, *Doe*, No. 3:25-mc-80286-TSH (N.D. Cal. filed Dec. 9, 2025), Dkt. No. 22; Stipulation of Dismissal, *Doe*, No. 3:25-mc-80325-PHK (N.D. Cal. filed Jan. 28, 2026), Dkt. No. 36.

[31] *See* Am. Compl. ¶¶ 1, 3, 10, *Aaron v. Bondi*, No 25-cv-4250 (D.D.C. filed Mar. 16, 2026), Dkt. No. 22.

violence or illegal conduct, and removed such posts and comments when they found them. Nevertheless, Bondi described the page as "being used to dox and target [ICE] agents in Chicago."[32]

49.     Through these various efforts to target individuals documenting and publishing information about immigration enforcement activity, DHS is instilling a climate of fear around information-gathering about and recording and dissemination of government activity and chilling constitutionally protected speech.

50.     Given ongoing immigration raids across the country and repeated DHS retaliation against individuals who document immigration enforcement activity and publish that information, the public has a strong interest in information about DHS policies and practices regarding individuals who engage in these activities.

## C.     PLAINTIFFS' FOIA REQUEST

51.     On November 18, 2025, Plaintiffs submitted the Request to DHS, CBP, ICE, and USCIS. A true and accurate copy of the Request is attached hereto as **Exhibit A.**

52.     Specifically, the Request sought, *inter alia*:

a.     Formal or informal policies, guidelines, memoranda, and communications pertaining to recording immigration and law enforcement activity, including agency interpretations of relevant criminal statutes and First Amendment protections for those engaged in these activities.

b.     Records concerning people arrested, detained, or subjected to a use of force for capturing or publishing recordings of federal immigration agents.

c.     Records concerning the tracking and surveillance of individuals and social media accounts engaged in documenting and publishing video or images of federal immigration agents.

d.     Records of communications with social media and technology companies regarding the publication of videos, photographs, and information about

---

[32] @AGPamBondi, X (Oct. 14, 2025, 10:23 AM), https://x.com/AGPamBondi/status/1978104370186137616; *see also* Pls.' Mem. of Law in Supp. of Mot. for Prelim. Inj., *Rosado v. Bondi*, No. 26-cv-1532 (N.D. Ill. filed Feb. 26, 2026), Dkt. No. 10-1.

immigration raids, including requests for social media user identification.

e.  Records of any internal complaints, grievances, or concerns raised within the Defendant agencies, or any internal investigations into actions taken against people for photographing, recording or disseminating video or images of federal immigration agents.

53.  Plaintiffs sought expedited processing of the Request on the basis that there is a "compelling need" for these records because the information requested is urgently needed by an organization primarily engaged in disseminating information in order to inform the public about actual or alleged federal government activity. 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5(e).

54.  Plaintiffs sought a waiver of all search, review, and reproduction fees on the basis that disclosure of the requested records is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11(k).

55.  Plaintiffs also sought a waiver of search fees on the basis that the ACLU qualifies as a "representative of the news media" and that the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. § 5.11(d)(1).

**D.   DEFENDANTS' RESPONSES TO THE REQUEST**

Defendant ICE

56.  On December 10, 2025, ICE acknowledged receipt of the Request by email and invoked a ten-day extension to respond to the Request. A true and correct copy of this email is attached hereto as **Exhibit D**.

57.  In the email, ICE denied Plaintiffs' request for expedited processing. ICE also stated that it would only adjudicate Plaintiffs' request for waiver of search, review, and reproduction fees if the agency is allowed to assess fees under the FOIA. On December 19, 2025, Plaintiffs responded with a request for clarification from ICE regarding its delay in adjudicating the fee waiver request.

58.  On December 31, 2025, ICE replied by email and explained that, if records are found, it would at that point review the request for a fee waiver and notify Plaintiffs of any fees prior to processing the case. A true and correct copy of this email is attached hereto as **Exhibit E**.

59. On January 7, 2026, ICE sent an email requesting further clarification of the Request and asking Plaintiffs to narrow the inquiry. In response, by email dated January 13, 2026, Plaintiffs narrowed the scope of the request by defining more precisely the scope of "law enforcement activities" encompassed by the Request and by dropping entirely two categories of records from the Request to ICE. Plaintiffs received no response. By email dated January 30, 2026, Plaintiffs asked ICE to confirm receipt and confirm that the agency was processing the request in accordance with the narrowed scope proposed in the January 13 email. On January 30, 2026, ICE confirmed receipt of Plaintiffs' previous correspondence, and indicated that the Request is pending. A true and correct copy of this email correspondence is attached as **Exhibit F**. Plaintiffs have received no further response to their Request from ICE.

Defendant CBP

60. On November 19, 2025, CBP acknowledged receipt of the Request by email and invoked a ten-day extension to respond to the Request. A true and correct copy of this email is attached hereto as **Exhibit B**.

61. On November 19, 2025, CBP denied Plaintiffs' request for expedited processing in a separate email. A true and correct copy of this email is attached hereto as **Exhibit C**. Plaintiffs have received no further response to their Request from CBP.

Defendant USCIS

62. On January 15, 2026, USCIS responded to Plaintiffs' FOIA request by email. The email stated that "[t]he activities referred to in the request do not fall under USCIS' responsibilities." While the email did not explicitly deny the request, it appeared to function as a blanket denial and refusal to search for responsive records. The email included a notice of Plaintiffs' right to pursue an administrative appeal within 90 days. A true and correct copy of this email is attached hereto as **Exhibit G**.

63. On March 9, 2026, Plaintiffs electronically submitted an administrative appeal of USCIS's denial of the request. The appeal explained that USCIS had violated FOIA by failing to search for responsive records and that USCIS's claim that the activities in question do not fall within its responsibilities was false and, in any case, was not a basis to refuse to conduct a search. The letter explained that USCIS is likely to have responsive records both because it collaborates with other

components of DHS to carry out enforcement operations and also because USCIS agents themselves now have the authority to conduct investigations, make arrests, and detain individuals pursuant to amended regulations promulgated on September 4, 2025. A true and correct copy of Plaintiffs' administrative appeal is attached hereto as **Exhibit H.**

64.    USCIS confirmed receipt of the administrative appeal through its online portal. Plaintiffs, however, have received no response to their administrative appeal from USCIS.

Defendant DHS

65.    On November 25, 2025, DHS contacted Plaintiffs to arrange a meeting to better understand the Request. On December 2, 2025, Plaintiffs met with DHS representatives to discuss the Request and methods of search for responsive records. A true and correct copy of the corresponding email exchange is attached hereto as **Exhibit I**.

66.    On December 3, 2025, DHS followed up with an email to request confirmation as to the agency's understanding of the Request. On December 8, 2025, Plaintiffs provided DHS with clarifications, and, the following day, DHS confirmed receipt of the clarifications. DHS indicated that the agency was processing the Request and would contact Plaintiffs with any further questions or issues. On January 30, 2026, Plaintiffs requested an update on the status of the Request. A true and correct copy of the email exchange is attached hereto as **Exhibit J**.

67.    On May 6, 2026, DHS acknowledged receipt of the Request by email and notified Plaintiffs that unspecified "parts of [the] request are a matter under the purview of [ICE], [CBP], and [FPS], other DHS components" and that parts of the request had been transferred to ICE, CBP, and FPS for processing and direct response. The letter stated that it did not constitute an "adverse action." A true and correct copy of this email is attached hereto as **Exhibit K.** Plaintiffs have received no further response to their request from DHS.

68.    On May 19, 2026, CBP notified Plaintiffs that it had received the referral from DHS but that, because it was the same request previously submitted to CBP, the referral "will not be created." A true and correct copy of this email is attached hereto as **Exhibit L.** Neither ICE nor FPS have provided Plaintiffs with any correspondence following the referral from DHS.

Exhaustion of Administrative Remedies

69. Under FOIA, an agency ordinarily has twenty working days to respond to a request. *See* 5 U.S.C. § 552(a)(6)(A)(i). If there are "unusual circumstances," an agency may extend the time limit by no more than ten working days. *See* 5 U.S.C. § 552(a)(6)(B)(i). An agency must respond to an administrative appeal within twenty working days. *See* 5 U.S.C. § 552(a)(6)(A)(ii). Plaintiff is deemed to have exhausted administrative remedies if the agency fails to comply with a statutory time limit. *See* 5 U.S.C. § 552(a)(6)(C)(i).

70. To date, ICE has neither released responsive records nor explained its failure to do so. ICE has also failed to adjudicate Plaintiffs' request for a fee waiver and limitation of fees.

71. To date, CBP has neither released responsive records nor explained its failure to do so. CBP has also failed to adjudicate Plaintiffs' requests for a fee waiver and limitation of fees.

72. To date, USCIS has taken no action on Plaintiffs' administrative appeal of USCIS's apparent denial of the Request. USCIS has also failed to adjudicate Plaintiffs' requests for a fee waiver, limitation of fees, and expedited processing.

73. To date, DHS has neither released responsive records nor explained its failure to do so. DHS has also failed to adjudicate Plaintiffs' requests for a fee waiver, limitation of fees, and expedited processing.

**CLAIMS FOR RELIEF**

74. Defendants' failure to make a reasonable effort to search for records responsive to the Request violates FOIA, 5 U.S.C. § 552(a)(3), and corresponding regulations.

75. Defendants' failure to promptly make available the records sought by the Request violates FOIA, 5 U.S.C. § 552(a)(3)(A), (a)(6)(A), and corresponding regulations.

76. Defendants' failure to grant Plaintiffs' request for a waiver of search, review, and duplication fees violates FOIA, 5 U.S.C. § 552(a)(4), (a)(6), and corresponding regulations.

77. Defendants' failure to grant Plaintiffs' request for a limitation of fees violates FOIA, 5 U.S.C. § 552(a)(4), (a)(6), and corresponding regulations.

78. Defendants DHS and USCIS's failure to grant Plaintiffs' request for expedited processing violates FOIA, 5 U.S.C. § 552(a)(6)(E), and corresponding regulations.

# REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

      A.      Order Defendants to immediately conduct a thorough search for all responsive records;

      B.      Order Defendants to immediately process and produce any responsive records;

      C.      Enjoin Defendants from withholding responsive records, or portions thereof;

      D.      Enjoin Defendants from charging Plaintiffs search, review, or duplication fees for the processing of the Request;

      E.      Order Defendants DHS and USCIS to grant expedited processing of the Request;

      F.      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

      G.      Grant such other relief as the Court deems just and proper.

Dated June 10, 2026                      Respectfully submitted,

/s/Jacob Snow
Jacob Snow
American Civil Liberties Union Foundation
of Northern California
39 Drumm Street
San Francisco, California 94111
Phone: (415) 621-2493

Scarlet Kim*
Ken Sexauer
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2500

Jonathan Manes*
Jessica Gingold*
Chisato Kimura*
MacArthur Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, IL 60611
Phone: 312-503-0012

*Pro Hac Vice Applications Forthcoming

Attorneys for Plaintiffs