# EXHIBIT A



November 18, 2025

Chief Privacy Officer/Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Avenue SE, Mail Stop 0655
Washington, D.C. 20528-065

FOIA Officer
U.S. Customs and Border Protection
1300 Pennsylvania Avenue NW
Mail Stop 1181
Washington, D.C. 20229-1181

National Records Center, FOIA/PA Office
U.S. Citizenship and Immigration Services
P.O. Boz 648010
Lee's Summit, MO 64064-8010

FOIA Office
U.S. Immigration & Customs Enforcement
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

**Re:** **Request Under Freedom of Information Act (Expedited Processing & Fee Waiver/Limitation Requested)**

To Whom It May Concern:

The American Civil Liberties Union, the American Civil Liberties Union Foundation, and the American Civil Liberties Union of Northern California (together, the "ACLU")[1] submit this Freedom of Information Act ("FOIA") request (the "Request") for records pertaining to Department of Homeland Security ("DHS") policies and practices regarding persons who

---

[1] The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about civil rights and civil liberties issues across the country. The American Civil Liberties Union is a separate non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.



photograph, film, livestream, or otherwise record immigration and law enforcement activity and/or publish that information.

## I. Background

As the Trump administration aggressively escalates immigration raids across the country, DHS is waging a widespread attack on those who seek to document and report on its activities. Heavily militarized and masked agents are swarming workplaces and neighborhoods, abducting people, and brandishing and deploying weapons to sow fear in surrounding communities. Throughout the chaos of immigration raids, it is typical for bystanders, journalists, legal observers, and loved ones to film or photograph the frightening scenes. As part of its violent deportation campaign, DHS agents are threatening and retaliating against those who record and publicize information about raids and associated protests.

The First Amendment protects the right to create, publish, and disseminate recordings of law enforcement officers performing their public duties.[2] From footage of law enforcement brutalizing Rodney King in 1991 to the video of Derek Chauvin murdering George Floyd in 2020, such recordings have proven critical to accomplishing the First Amendment's core purposes: the free discussion of government affairs, the uncovering of abuses, and democratic pushes for government accountability and policy change. They can also be crucial to track and provide legal

---

[2] *See Fields v. City of Philadelphia*, 862 F.3d 353, 358–59 (3d. Cir. 2017) ("[T]he First Amendment protects . . . recording police officers" because it "falls squarely within the First Amendment right of access to information" and because "for th[e First Amendment protection of photos and videos] to have meaning[,] the Amendment must also protect the act of creating that material."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist[.]"); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012) (the right to record police is protected as a "medium of expression," "an integral step in the speech process," and part of "the gathering and dissemination of information about government officials"); *Glik v. Cunniffe,* 655 F.3d 78, 82 (1st Cir. 2011) ("filming of government officials engaged in their duties" is protected as "gathering information about government officials"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (individuals "ha[ve] a First Amendment right . . . to photograph or videotape police conduct" because "[t]he First Amendment protects . . . a right to record matters of public interest"); *Fordyce v. City of Seattle*, 55 F.3d 436, 438–39 (9th Cir. 1995) (recording police conduct during a protest implicated the "First Amendment right to gather news").



support to detained people and to counter false statements about law enforcement incidents.[3] Video recordings of recent immigration enforcement activity have served all of these purposes.[4]

Despite these constitutional protections, DHS has attacked public recording of and reporting on its activities. A June 2025 DHS bulletin directed officers to consider "use of cameras," "livestreaming" and videorecording at protests as "unlawful civil unrest" tactics and "threats."[5] At a July 2025 press event, DHS Secretary Kristi Noem declared that "violence" includes "anything that threatens [DHS agents] and their safety. So it is doxing them. It is videotaping them where they're at."[6] DHS Assistant Secretary for Public Affairs Tricia McLaughlin later reinforced this characterization of filming agents, telling reporters that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents . . . . We will prosecute those who illegally harass ICE agents to the fullest extent of the law."[7]

These statements are consistent with widely reported DHS practices on the ground, where government agents are targeting journalists as well as bystanders and others recording immigration and law enforcement activity. In numerous reports, agents have aimed firearms and other weapons or assaulted individuals attempting to film DHS activity on public streets, identify officers, or capture ICE vehicle license plate numbers. For example, in June, a U.S. citizen, Arturo Hermosillo, saw masked federal agents surround a woman lying on the ground. He recognized the woman, whom he described as "a fixture in the neighborhood," and parked his van and began recording

---

[3] In recent litigation challenging immigration raids in Chicago, for example, images and recordings of law enforcement officers formed part of the basis for a motion for a temporary restraining order ("TRO") (Emergency Mot. for TRO at 10, 28, *Chicago Headline Club v. Noem,* No. 25-cv-12173, 2025 WL 3124141 (N.D. Ill. 2025), Dkt. No. 21) and for later notices to the court of evidence of violations of the TRO (Pls.' Notice of Violations of the Ct.'s TRO, *Chicago Headline Club*, No. 25-cv-12173, Dkt. Nos. 94, 140).

[4] *See, e.g.*, Luis Ferré-Sadurní, *ICE Officer 'Relieved of His Duties' After Pushing Woman to Floor*, N.Y. Times (Sept. 26, 2025), https://perma.cc/9GVP-HQ6Z; Eric Levenson, Masked Agents and Public Arrests: A Closer Look at ICE's Increasingly Aggressive Tactics, CNN (Aug. 25, 2025); https://perma.cc/6RXV-ZA7L; Sam Levin, *US Citizens Jailed in LA ICE Raids Speak Out: 'They came ready to attack'*, The Guardian (Aug. 5, 2025), https://perma.cc/Q7M5-DQXV; Nicole Foy & McKenzie Funk, *Immigration Officers Smash Car Windows to Speed Up Arrests: "We'll Smash the Fucking Window Out and Drag Him Out"*, ProPublica (July 31, 2025), https://perma.cc/R2PR-8F8E.

[5] Ex. A to Decl. of Ryan Shapiro in Supp. of Pls.' Prelim. Inj., *Los Angeles Press Club v. Noem*, No. 25-cv-5563 2025 WL 2658327 (C.D. Cal. 2025), Dkt. No. 34–19.

[6] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, (YouTube, July 14, 2025), https://perma.cc/8NY8-JAHW.

[7] Matthew Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents is "Violence"*, The Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/ZYU9-FAP6.



the events on his phone. Immigration agents ordered him to leave, punched him, threw him to the ground, knelt on his back, and detained him for hours.[8] In a separate incident that same day, Job Garcia, a 37-year old graduate student, witnessed ICE agents chasing workers in a Home Depot parking lot and began filming on his phone. The agents assaulted and arrested him.[9]

DHS is also investigating and targeting immigrants and their supporters in retaliation for reporting on law enforcement activity. In June 2025, police officers arrested Emmy award-winning journalist Mario Guevara while he was reporting on a protest.[10] Prosecutors concluded that Mr. Guevara had in fact complied with law enforcement directives and swiftly dropped the criminal charges against him.[11] Nevertheless, ICE, which had taken Mr. Guevara into its custody, refused to release him even after an immigration judge granted him bond, claiming that his livestreaming and publication of videos of law enforcement activity made him dangerous.[12] In August 2025, ICE detained Tatiana Martinez, who was known for livestreaming ICE enforcement activity to her audience of nearly 50,000 followers.[13] After detaining her, immigration officers repeatedly told her "Did you think that you were going to get away with recording our activities and there wouldn't be a consequence?"[14] DHS also appears to be pursuing investigations into a number of social media accounts that report on ICE activity. In September 2025, a federal judge blocked a DHS administrative subpoena seeking information about Instagram accounts that identified an agent involved in immigration raids.[15] Then in October 2025, another federal judge blocked a DHS administrative subpoena seeking information about social media accounts that track local ICE

---

[8] Jonah Valdez, *A Pattern of Violence: Documenting ICE Agents' Brutal Use of Force in LA Immigration Raids*, The Intercept (July 7, 2025), https://perma.cc/3EMJ-R5EJ.

[9] *Id.* Further examples abound in First Am. Compl., *Los Angeles Press Club*, No. 25-cv-5563, Dkt. No. 67, at ¶¶ 50–237.

[10] *See* Emergency Mot. for TRO and/or Prelim. Inj., *Guevara v. Francis,* No. 25-cv-104 (S.D. Ga. 2025), Dkt. No. 2, https://perma.cc/35LR-FLKW; Pet. for Writ of *Habeas Corpus* and Compl., *Guevara v. Francis*, No. 25-cv-86 (S.D. Ga. 2025), Dkt. No. 1, https://perma.cc/35LR-FLKW.

[11] *Id*.

[12] *Id*.

[13] Sophie Flay, *TikToker arrested by federal agents while live streaming to thousands in downtown LA*, ABC7 (Sep. 2, 2025), https://perma.cc/UB95-A5L6.

[14] Katie Hawkinson, *TikTok Influencer Who Livestreamed Her Own Arrest Was Targeted for Documenting ICE Agents, Lawyer Says*, The Independent (Sept. 2, 2025), https://perma.cc/4P7H-372S.

[15] Shawn Musgrave, *Courts Block Meta from Sharing Anti-ICE Activists' Instagram Account Info with Feds*, The Intercept (Sept. 24, 2025), https://perma.cc/K8GB-9RZG.



activity in Montgomery County, Pennsylvania.[16] Through these various efforts to target journalists and others documenting immigration enforcement activity, DHS is chilling constitutionally protected speech, instilling a climate of fear around reporting on government activity and demanding self-censorship.

To provide the public with information about DHS policies and practices regarding persons that photograph, film, livestream, or otherwise record immigration and law enforcement activity and/or publish that information, the ACLU submits this FOIA request.

## II. Requested Records

(1)    Formal or informal policies, guidance, procedures, directives, bulletins, memoranda, legal opinions, instructions, training documents, presentations, talking points, and all other communications pertaining to photographing, filming, livestreaming, or recording immigration and law enforcement activity, including but not limited to, records about:

   a.   Concerns regarding these activities, including but not limited to, harm to ICE, CPB, USCIS, Federal Protective Service ("FPS"), and DHS agents, and other government officials;

   b.   Criminal statutes that may pertain to these activities, including but not limited to, 18 U.S.C. § 111 and 18 U.S.C. § 119;

   c.   First Amendment protections for journalists, legal observers, bystanders, and others engaged in these activities;

   d.   Use of force, arrest, and/or detention of individuals engaged in these activities;

   e.   Monitoring, surveilling, observing, questioning, interrogating, and/or otherwise investigating individuals, groups, or social media accounts that engage in these activities or publish information about immigration and law enforcement activity;

---

[16] Chris Palmer & Jeff Gammage, *A Federal Judge Blocked Facebook From Giving Information to DHS About Montco Activists Who Track ICE on Social Media*, The Philadelphia Inquirer (Oct. 17, 2025), https://perma.cc/3BS6-CAND.



(2)   Records containing the terms "dox(ing)", "doxx(ing)", or "livestream(ing)," since January 20, 2025;

(3)   Federal Protective Service ("FPS") records, including but not limited to Intelligence Operations Division Assessments, containing the words "doxing"; "doxxing"; or "livestream(ing)," since January 20, 2025;

(4)   Records since January 20, 2025, indicating:

   a.   The number and names of individuals who have been subject to the use of force, arrest, and/or detention while photographing, filming, livestreaming, or recording immigration and law enforcement activity, or after publishing this information, including to allegedly "dox" or "doxx" ICE, CBP, FPS, DHS agents or other government officials, or to allegedly interfere with their duties;

   b.   The number and names of individuals (including journalists), groups (including news outlets), social media accounts, and apps that have been subject to monitoring, surveillance, questioning, interrogation, and/or investigation that are known to have photographed, filmed, livestreamed, or recorded immigration and law enforcement activity, or published this information, including to allegedly "dox" or "doxx" ICE, CBP, FPS, DHS agents or other government officials, or to allegedly interfere with their duties;

(5)   Records concerning complaints, grievances, and/or concerns raised by ICE, CBP, FPS, DHS agents or other government officials related to the photographing, filming, livestreaming, recording, "doxing" or "doxxing" of ICE, CBP, FPS, or DHS agents or other government officials since January 20, 2025;

(6)   Records concerning investigations of and/or disciplinary action against ICE, CBP, FPS, DHS agents or other government officials related to the use of force, arrest, and/or detention of individuals photographing, filming, livestreaming, or recording immigration and law enforcement activity, or publishing this information, since January 20, 2025;

(7)   Communications to or from employees or representatives of any social media network, app marketplace, or technology company concerning the photographing, filming, livestreaming, or recording of immigration and law enforcement activity, or the publishing, removal, promotion, or de-prioritizing of any such information,



including relating to "doxing" or "doxxing" or interference with official duties, since January 20, 2025;

(8)   Communications to or from employees or representatives of any social media network, app marketplace, or technology company concerning a request for information about accounts or users posting photographs, videos, livestreams, or other recordings of immigration and law enforcement activity, including relating to "doxing" or "doxxing" or interference with official duties, since January 20, 2025;

(9)   Records, including but not limited to all communications, concerning:

   a.   June 2025 FPS bulletin directing officers to consider "use of cameras," "livestreaming" and video recording at protests as "unlawful civil unrest" tactics and "threats" (attached as Exhibit A);

   b.   Secretary Noem's July 2025 statement that "violence" includes "anything that threatens [DHS agents] and their safety. So it is doxing them. It is videotaping them where they're at";[17]

   c.   Assistant Secretary McLaughlin's September 2025 statement that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents" and that DHS "will prosecute those who illegally harass ICE agents to the fullest extent of the law;"[18]

(10)   Records concerning the settlement in *Askins v. DHS*, No. 12-cv-2600 (S.D. Cal. 2012), including but not limited to, communications concerning compliance with the settlement, since January 20, 2025;

(11)   Records created, sent, received, referenced, and/or used in fulfilling and/or responding to this Request.

### III. Preferred Format and Delivery

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the ACLU requests that responsive records be delivered via email to byoon@aclu.org and scarletk@aclu.org. Please provide the requested documents in the following format:

---

[17] Forbes Breaking News, *supra*, note 6.

[18] Matthew Cunningham-Cook, *supra* note 7.



(1) in a text-searchable, static-image format (PDF wherever possible), with the exception of data records, which should be in native format (*i.e.* Excel spreadsheets in Excel);

(2) in the best image quality in the agency's possession;

(3) in separate, Bates-stamped files for each agency;

(4) without password protection;

(5) with "parent-child" relationships maintained, meaning that the ACLU must be able to identify the attachments with emails;

(6) with emails including bcc and any other hidden fields; and

(7) with any other metadata preserved.

## IV. Application for Expedited Processing

The ACLU requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).[19] There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

A.    *The ACLU is an organization primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II).[20] Obtaining information about government activity, analyzing that information, and widely publishing and disseminating it to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding a non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").[21]

---

[19] *See also* 6 C.F.R. § 5.5(e).

[20] *See also* 6 C.F.R. § 5.5(e)(1)(ii).

[21] Courts have found that the ACLU as well as other organizations with similar missions that engage in information-dissemination activities similar to the ACLU are "primarily engaged in disseminating information." *See, e.g.*, *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. DOD,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003).



The ACLU regularly publishes the *ACLU* magazine that reports on and analyzes civil liberties-related current events. The magazine is disseminated to over 1 million donors. The ACLU also publishes regular updates and alerts via email to 4.8 million subscribers (both ACLU members and non-members). These updates are additionally broadcast to over 6.6 million social media followers. The magazine as well as the email and social-media alerts often include descriptions and analysis of information obtained through FOIA requests.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news,[22] and ACLU attorneys are interviewed frequently for news stories about documents released through ACLU FOIA requests.[23]

Similarly, the ACLU publishes reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA requests. This material is broadly circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee. ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[24] The ACLU also regularly publishes books, "know

---

[22] *See, e.g.*, Press Release, ACLU, *ACLU FOIA Litigation Reveals New Information About Plans to Expand ICE Detention in Colorado* (Jul. 9, 2025), https://perma.cc/8B5B-QNUT; Press Release, ACLU, *New Records Detail How the FBI Pressures Police to Keep Use of Shady Phone Surveillance Technology a Secret* (June 22, 2023), https://perma.cc/TY4G-LHTQ; Press Release, ACLU, *Government Releases New Court Opinions Highlighting Further Abuse of Warrantless FISA Surveillance Program* (July 21, 2023), https://perma.cc/AZU4-NQER; Press Release, ACLU, *New Records Detail DHS Purchase and Use of Vast Quantities of Cell Phone Location Data* (July 18, 2022), https://perma.cc/J83J-KW5S; Press Release, ACLU, *New Documents Reveal NSA Improperly Collected Americans' Call Records Yet Again* (June 26, 2019), https://perma.cc/YR8Z-DQTY.

[23] *See, e.g.*, Corin Faife, *Feds Are Tracking Phone Locations With Data Bought From Brokers*, The Verge (July 18, 2022), https://perma.cc/QL9P-C6KW; Charlie Savage, *N.S.A. Gathered Domestic Calling Records It Had No Authority to Collect*, N.Y. Times (June 26, 2019), https://perma.cc/SMU9-SM37 (quoting ACLU attorney Patrick Toomey); Rachel Frazin, *ACLU Sues FBI Over Black Activist Surveillance Records*, The Hill, (Mar. 21, 2019), https://perma.cc/K3TR-X6FQ; Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavioral Screen Program*, Intercept (Feb. 8, 2017), https://perma.cc/GEK7-343U; Larry Neumeister, *Judge Scolds Government over Iraq Detainee Abuse Pictures*, The Associated Press (Jan. 18, 2017), https://perma.cc/U7WD-GMYX; Karen DeYoung, *Newly Declassified Document Sheds Light on How President Approves Drone Strikes*, Wash. Post (Aug. 6, 2016), https://perma.cc/DKY5-Z446; ABC News, *What Newly Released CIA Documents Reveal About 'Torture' in Its Former Detention Program* (June 15, 2016), https://perma.cc/6WZZ-ME3R ; Nicky Woolf, *US Marshals Spent $10M on Equipment for Warrantless Stingray Device*, Guardian (Mar. 17, 2016), https://perma.cc/U6GR-RX9Y.

[24] *See, e.g.*, Eunice Hyunhye Cho, *ACLU FOIA Litigation Reveals Information About ICE Capacity, Contracts in Facilities Nationwide* (May 8, 2025), https://perma.cc/KH6X-872V; ACLU, *Bad Trip: Debunking the TSA's 'Behavior Detection' Program* (Feb. 2017), https://perma.cc/GQ2Z-JUMM; Carl Takei, *ACLU-Obtained Emails*



your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties.

The ACLU publishes a widely read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily. *See* https://www.aclu.org/blog. The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. *See e.g.*, https://www.aclu.org/podcast. The ACLU also publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU's website also serves as a clearinghouse for news about ACLU cases, including analysis about case developments and an archive of case-related documents. Through these pages, and with respect to each specific civil liberties issue, the ACLU provides the public with educational material, recent news, analyses of relevant congressional or executive branch action, government documents obtained through FOIA requests, and further in-depth analytic and educational multi-media features.[25]

The ACLU website includes many features on information obtained through FOIA. For example, the ACLU maintains an online "Torture Database," a compilation of over 100,000 pages of FOIA documents that allows researchers and the public to conduct sophisticated searches of its contents relating to government policies on rendition, detention, and interrogation.[26] The ACLU

---

*Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site* (Nov. 22, 2016), https://perma.cc/267S-MM8H; Brett Max Kaufman, *Details Abound in Drone 'Playbook' – Except for the Ones That Really Matter Most* (Aug. 8, 2016), https://perma.cc/T4LW-XZFU; Nathan Freed Wessler, *ACLU-Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida* (Feb. 22, 2015), https://perma.cc/DPJ9-3X7C.

[25] *See, e.g., U.S. DOGE Service Access to Sensitive Agency Records Systems FOIA*, ACLU Case Page, https://perma.cc/BGW3-RWYU; *ACLU v. ODNI*—FOIA Lawsuit Seeking Records About Government Surveillance Under the USA Freedom Act, ACLU Case Page, https://perma.cc/Y6LR-E5L3; *ACLU v. DOJ*: FOIA Lawsuit Seeking Information on Federal Agencies' Surveillance of Social Media, ACLU Case Page, https://perma.cc/EM2V-MSJU; *ACLU v. DOJ*—FOIA Case for Records Relating to Targeted Killing Law, Policy, and Casualties, ACLU Case Page, https://perma.cc/X76C-KSTW; Executive Order 12,333—FOIA Lawsuit, ACLU Case Page, https://perma.cc/E9LV-PLFZ; ACLU v. United States, ACLU Case Page, https://perma.cc/MR69-ZDU5; *ACLU v. DOJ*—FOIA Lawsuit Demanding OLC Opinion "Common Commercial Service Agreements", ACLU Case Page, https://perma.cc/A3P5-83QD; FOIA Request for Justice Department Policy Memos on GPS Location Tracking, ACLU Case Page, https://perma.cc/TLN9-4E4J.

[26] *The Torture Database*, ACLU Database, https://www.thetorturedatabase.org; *see also* FOIA Database Regarding the U.S. Government's Violent Extremism Initiatives, ACLU Database, https://perma.cc/G9RT-M98A;



has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through the FOIA.[27]

The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the Requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.

B.      *The records sought are urgently needed to inform the public about actual or alleged government activity.*

These records are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).[28] Specifically, they pertain to DHS policies and practices regarding persons who photograph, film, livestream, or otherwise record immigration and law enforcement activity and/or publish that information. As discussed in Part I, *supra*, DHS official statements and apparent retaliatory actions are the subject of widespread public controversy and media attention. Given this media interest and the lack of public information about how DHS engages with constitutionally protected speech, there is an urgent need to inform the public about the agency's policies and practices. Expedited processing is therefore appropriate under 5 U.S.C. § 552(a)(6)(E) and the DHS implementing regulations.[29]

## IV. Application for Waiver or Limitation of Fees

The ACLU requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C.

---

*TSA Behavior Detection FOIA Database*, ACLU Database, https://perma.cc/GQ4A-MLPB; *Targeted Killing FOIA Database*, ACLU Database, https://perma.cc/BZ6C-7DXE.

[27] *See e.g. New Records Detail How the FBI Pressures Police to Keep Use of Shady Phone Surveillance Technology a Secret*, ACLU (Jun. 22, 2023), https://perma.cc/Y3CS-YBWT; *Summary of FISA Amendments Act FOIA Documents Released on November 29, 2010*, ACLU (Nov. 29, 2010), https://perma.cc/RCK5-3GAX; *Statistics on NSLs Produced by Department of Defense*, ACLU, https://perma.cc/32LP-ZSE5; *Index of Bush-Era OLC Memoranda Relating to Interrogation, Detention, Rendition and/or Surveillance*, ACLU (Mar. 5, 2009), https://perma.cc/PZ9R-69AF.

[28] *See also* 6 C.F.R. § 5.5(e)(1)(ii).

[29] *See also* 6 C.F.R. § 5.5(e)(1)(ii).



§ 552(a)(4)(A)(iii).[30] The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

A.     *The Request is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU.*

As discussed above, this Request concerns DHS policies and practices regarding persons who photograph, film, livestream, or otherwise record immigration and law enforcement activity and/or publish that information. Little information is publicly available regarding the DHS policies and practices at issue in this Request, so the records sought are certain to contribute significantly to the public's understanding of the agency's policies and practices regarding constitutionally protected speech and any associated risks with exercising certain First Amendment rights.

The ACLU is not filing this Request to further its commercial interest. As described above, any information disclosed by the ACLU as a result of this FOIA Request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted)).

B.     *The ACLU is a representative of the news media and the records are not sought for commercial use.*

The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).[31] The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III)[32]; *see also Nat'l Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network*

---

[30] *See also* 6 C.F.R. § 5.11(k)(1).

[31] *See also* 6 C.F.R. § 5.11(k)(2)(iii).

[32] *See also 6 C.F.R. § 5.11(b)(6).*



*v. Dep't of Defense*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. Dep't of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 29 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is therefore a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information."

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media" as well. *See, e.g.*, *Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr. V. Dept. of Defense*, 241 F. Supp. 2d 5 (D. D.C 2003) at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[33]

On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU as a "representative of the news media."[34] As was true in those instances, the ACLU meets the requirements for a fee waiver here.

---

[33] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information and public education activities. *See, e.g.*, *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d; *Nat'l Sec. Archive*, 880 F.2d at 1387; s*ee also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53–54.

[34] The ACLU regularly receives FOIA fee waivers from federal agencies. For example, in June 2018, the U.S. Citizenship and Immigration Services granted a fee-waiver request regarding a FOIA request for documents relating to the use of social media surveillance. In August 2017, CBP granted a fee-waiver request regarding a FOIA request for records relating to a muster sent by CBP in April 2017. In June 2017, the Department of Defense granted a fee-waiver request regarding a FOIA request for records pertaining to the authorities approved by President Trump in March 2017 which allowed U.S. involvement in Somalia. In June 2017, the Department of Defense, the CIA, and the Office of Inspector General granted fee-wavier requests regarding a FOIA request for records pertaining to U.S. involvement in the torture of detainees in prisons in Yemen, Eritrea, and aboard Yemeni or Emirati naval vessels. In May 2017, CBP granted a fee-waiver request regarding a FOIA request for documents related to electronic device searches at the border. In April 2017, the CIA and the Department of State granted fee-waiver requests in relation to a FOIA request for records related to the legal authority for the use of military force in Syria. In March 2017, the Department of Defense Office of Inspector General, the CIA, and the Department of State granted fee-waiver requests regarding a FOIA request for documents related to the January 29, 2017 raid in al Ghayil, Yemen. In June 2016, the



*    *    *

Pursuant to applicable statutes and regulations, the ACLU expects a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii); 6 C.F.R. 5.5(e)(4).

If the Request is denied in whole or in part, the ACLU asks that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or deny a waiver of fees.

Thank you for your prompt attention to this matter. Please see Section III on preferred format and delivery preferences for responsive records.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

Sincerely,

Byul Yoon
Scarlet Kim
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
byoon@aclu.org
scarletk@aclu.org

Jake Snow
American Civil Liberties Union
   Foundation of Northern California
39 Drumm Street
San Francisco, CA  94111
T: 415.621.2493
jsnow@aclunc.org

---

Office of the Director of National Intelligence granted a fee-waiver request regarding a FOIA request related to policies and communications with social media companies' removal of "extremist" content. In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the Department of Justice for documents related to Countering Violent Extremism Programs.

# EXHIBIT A

**OFFICER AWARENESS**

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE



**Intelligence Operations Division**

Assessment

## (U) RECENT ANTI-LAW ENFORCEMENT TACTICS USED IN UNLAWFUL CIVIL UNREST

### (U) OVERVIEW
(U//FOUO) This assessment addresses law enforcement safety issues from identified tactics used during recent 1st Amendment protected demonstrations, and unlawful civil unrest, targeting Law Enforcement. U.S. Immigration and Customs Enforcement (ICE) immigration enforcement operations have become a highly sensitive and prevalent issue throughout the nation, while garnering much media attention. Therefore, it is highly likely that anti-ICE and other Federal Law Enforcement Officers (LEOs) events will continue to occur throughout the nation.

### (U) BACKGROUND
(U//FOUO) On June 6, 2025, ICE carried out a series of immigration enforcement raids in the Fashion District of Los Angeles, California. While these enforcement actions were in progress, information began to circulate in the local community and individuals flocked to the area to impede ICE operations. Shortly after, individuals and groups assembled and held demonstrations outside of the Edward R. Roybal Federal Building and U.S. Courthouse, in downtown Los Angeles. Since this day, numerous demonstrations and civil unrest activities have occurred nationwide, leading to the arrests of numerous violent offenders (VO), and resulting in multiple LEOs sustaining injuries.

### (U) TACTICS
(U//FOUO) Below are common tactics used by demonstrators and VOs. Many of these tactics have been used during recent demonstrations and civil unrest activities in multiple locations across the nation. We anticipate that any success displayed in one city will be adopted by VOs in another city.

#### (U) Weapons
(U//LES) Everyday objects and easily attainable items - e.g., bricks, rocks, bottles, lasers, skateboards, strobe lights, and other bright lights are used as weapons or become improvised weapons during unlawful civil unrest. Other items such as paint-filled fire extinguishers, tear gas, smoke grenades, commercial grade fireworks and firearms, have or may also be used by VOs. Easy to make items may include Molotov cocktails and VOs may utilize innocuous support vehicles containing weapons and supplies.
- (U//FOUO) The use of green lasers has been used for numerous demonstrations leading to injuries to the eyes of LEOs. Specifically, in Portland, Oregon it was reported that there were 113 eye injuries from lasers.[i]
- (U//FOUO) The carrying of a cinder block by VOs allows them to break off pieces and throw them at officers. Some VOs may have cinder blocks placed in specific areas, or along marching routes, to have a readymade improvised weapon close at hand.[ii,iii]
- (U//FOUO) Reporting indicates a there is circulating video, being viewed by VOs, which provides instruction on how to empty fire extinguishers and refill them with paint. These paint-filled extinguishers

(U//FOUO) All information contained within this product was obtained through open source, law enforcement and intelligence community channels and is unclassified; however, this report is to be handled as LAW ENFORCEMENT SENSITIVE. It may be disseminated to those within the law enforcement, security and intelligence community who have a need-to-know. At no time is any of this information to be provided to the general public or any individual or organization associated with a media affiliate.

For immediate reporting of incidents or suspicious activities, contact the 24-hour number for FPS call (877) 437-7411

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

**\*\*\* FOR OFFICIAL USE ONLY \*\*\* LAW ENFORCEMENT USE ONLY \*\*\***

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

can then be used to vandalize buildings or to spray LEOs, ultimately blinding them and/or impeding their movements.[iv]

- (U//FOUO) On Saturday, June 7, 2025, an individual was arrested, and charged with possessing of an unregistered destructive device, because he threw a Molotov cocktail at LEOs. In another incident, an individual was identified carrying a Molotov cocktail and a lighter; and while trying to flee the scene, the individual allegedly threw the device at the LEOs.[v]

*(U) Assaults*

(U//LES) Assault on LEOs can occur in a variety of ways, including the utilization of standardized and/or improvised weapons. Black Bloc tactics (wearing all black attire), to conceal the offender's identity is commonly used when conducting assaults and vandalism.

- (U//FOUO) News media reports from Los Angeles on June 10, 2025, an anti-ICE demonstrator was distributing boxes of "Bionic [Face] Shields" to other individuals. During an event on this same day in New York City, New York, many demonstrators were observed wearing Black Bloc attire.[vi]

*(U) Vandalism and Property Damage*

(U//LES) Vandalism and property damage such as arson, graffiti, slashed vehicle tires, looting and damage to businesses and law enforcement resources, destruction of security equipment, and broken windows and doors, are common crimes associated with civil unrest.

- (U//FOUO) On June 10, 2025, the Senator Paul Simon Federal Building in Carbondale, Illinois was vandalized by demonstrators who were gathered outside of the facility.[vii,viii]
- (U//FOUO) On June 12, 2025, in Tucson, Arizona outside an ICE office, VOs threw balloons filled with paint at security officers and spray-painted anti-ICE graffiti on gates and walls.[ix]
- (U//FOUO) On Saturday, June 8, 2025, reports state that VOs lit numerous vehicles on fire and looted numerous businesses overnight.[x]

*(U) Barricades*

(U//LES) Barricades present a problem for LEOs, impeding their ability to easily apprehend criminals and VOs. These barricades can lead to the kettling of LEOs, which restricts and confines their movements, thus leaving them more susceptible to being assaulted. Various objects can be used as a barricade, such as benches, shopping carts, trash bins, cinder blocks, and much more.

- (U//FOUO) Since the beginning of the demonstrations in Los Angeles, there have been reports of individuals using motorcycles, dumpsters, park benches, and zip tied bikes as barricades to impede LE movements.[xi]

*(U) Surveillance*

(U//LES) A wide variety of surveillance methods can be used to identify LEOs and their positions or assets. Surveillance allows demonstrators to develop and strategize methods to interact with or intercept LEOs. Additionally, surveillance allows for the identification of alternate routes for evading LEOs, identifying targets for acts vandalism or damage, and accessing easily attainable items to be used as weapons.

- (U//FOUO) Methods include drones, bicyclists, skateboarders, or scouts on foot.
- (U//FOUO) On June 10, 2025, near a Walmart in Phoenix, Arizona, a drone operator posted video footage of ICE agents conducting enforcement operations.
- (U) Social media is also being utilized as a format for individuals to share videos to get more people involved in their ideological movements, or for surveillance sharing.[xii]

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Page 2 of 4

*** FOR OFFICIAL USE ONLY *** LAW ENFORCEMENT USE ONLY ***

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

*(U) Threats to LEOs*
(U//LES) One of the most common methods of threatening LEOs comes from online doxing (doxxing), releasing private identification of an individual online for nefarious purposes. Other tactics include, hoax bomb threats, livestreaming LEO interactions, following LEOs to their vehicles, offices, and hotels.

- (U//FOUO) Various sources report that demonstrators are actively identifying hotels being utilized by LEOs and then subsequently harassing them, while also trying to interrupt their sleep by using bullhorns and playing loud music.[xiii,xiv] Additionally, there have been reports of bomb threats against ICE field offices across the nation.[xv]
- (U//FOUO) Saturday, June 8, 2025, VOs threw rocks, blocks of cement, electric scooters, and shot commercial grade fireworks from an overpass at LEOs assembled below the roadway.[xvi]

**(U) ANALYSIS**
(U//FOUO) Because of the large amount of media attention, the sensitive topic of immigration enforcement, and controversy surrounding the deployment of US military personnel, we assess with a high likeliness that demonstrations and civil unrest will continue to occur at federal facilities in the near term. It is expected that additional demonstrations will continue and grow across the nation. We also assess with high likeliness that currently planned demonstrations addressing different topics and issues may shift to demonstrations concerning immigration enforcement actions and an embracement of anti-ICE messaging.

(U//FOUO) We assess demonstrators and VOs may try to generate media attention by utilizing various tactics and/or attempting to engage LEOs to provoke a response. Individuals, or groups, who desire to implement an attack on LEOs may not distinguish between different law enforcement agencies and may conduct an attack if such an opportunity exists. Further, individuals most likely will use social networking sites and apps to quickly mobilize and coordinate activities, making it difficult for law enforcement to intercept and prepare a response in advance.

**(U) SUSPICIOUS ACTIVITY & PROTECTIVE MEASURES**
(U//FOUO) Federal facilities are symbols of the American federal government and are often viewed as desirable targets. An attack on a federal facility can occur in a variety of ways and is only limited to the imagination of the individual(s) who are planning, coordinating, and executing the attack. Law enforcement officers and security personnel must remain vigilant for any threats and properly report any suspicious activity occurring in, and around, federal buildings and assets.

(U//FOUO) Activities by LEOs considered as a best practices are:
- (U) Remain observant for indicators of suspicious behavior that may reasonably indicate criminal activity;
- Explore procurement and use of laser-defeating goggles or glasses to protect the eyes of LEOs when attacked with lasers
- (U) Observe and report on individuals showing prolonged interest in security apparatus, discreet use of cameras, note taking, testing security;
- (U) Be cognizant of unusual attempts to gain sensitive information about countermeasures, HVAC systems, and security measures;
- (U) Use variably-timed interior and exterior patrols to deter perceived vulnerabilities, thwart the ability to time an attack, detect suspicious activity and prevent unauthorized entry;
- (U) Evaluate the effectiveness of countermeasures from the point of view of an adversary;
- (U) Actively enforce parking regulations and investigate illegally parked vehicles - particularly in buffer zones;
- (U) Employ Operation Shields and targeted patrols using a risk-based deployment model.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE
Page 3 of 4

**\*\*\* FOR OFFICIAL USE ONLY \*\*\* LAW ENFORCEMENT USE ONLY \*\*\***

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

For further queries regarding this bulletin or questions regarding the dissemination process, please contact:
Federal Protective Service, Intelligence Operations Division
FPSINTEL@fps.dhs.gov

[i] (U) Nelson, S. (August 4, 2020). Federal officers in Portland suffered 113 eye injuries from lasers, DHS official says. New York Post. Unclassified. Accessed on June 12, 2025, regional news organization. https://nypost.com/2020/08/04/federal-officers-in-portland-suffered-113-eye-injuries-from-lasers-dhs/.

[ii] (U) DuBose, J. (June 9, 2025). FBI identifies protester accused of throwing rocks at federal agents. KTLA5. Unclassified. Accessed on June 12, 2025. https://ktla.com/news/local-news/l-a-protester-40-wanted-by-fbi-for-assault-on-federal-officer-identified/.

[iii] (U) Crane, E. (June 10, 2025) 'Worrying' footage shows anti-ICE protester doling out tactical gear in Los Angeles as violence escalates. New York Post. Unclassified. Accessed on June 12, 2025. https://nypost.com/2025/06/10/us-news/footage-shows-anti-ice-protestor-doling-out-tactical-gear-in-los-angeles/.

[iv] (U//FOUO//LES) NYPD SENTRY (June 12, 2025). "SENTRY - Los Angeles, CA - Protests turned violent - civil unrest." (e-mail).

[v] (U) Sternfield, M. (June 11, 2025). 2 men charged with throwing Molotov cocktails at officers during protests. KTLA5. Unclassified. Accessed on June 13, 2025, regional news organization. https://ktla.com/news/local-news/2-men-charged-with-throwing-molotov-cocktails-at-officers-during-protests/.

[vi] (U) Crane, E. (June 10, 2025) 'Worrying' footage shows anti-ICE protester doling out tactical gear in Los Angeles as violence escalates. New York Post. Unclassified. Accessed on June 12, 2025. https://nypost.com/2025/06/10/us-news/footage-shows-anti-ice-protestor-doling-out-tactical-gear-in-los-angeles/.

[vii] (U) Tock, O. (June 11, 2025). Federal building vandalized in Carbondale' FBI investigating. 12 KFVS. Unclassified. Accessed on June 12, 2025, regional news organization. https://www.kfvs12.com/2025/06/11/federal-building-vandalized-carbondale-fbi-investigating/.

[viii] (U) Barry, L. (June 11, 2025) U.S. Attorney, FBI vow strong action after federal building defaced in Carbondale. U.S. Attorney's Office, Southern District of Illinois. Accessed on June 12, 2025, US Federal Agency. https://www.justice.gov/usao-sdil/pr/us-attorney-fbi-vow-strong-action-after-federal-building-defaced-carbondale.

[ix] (U) Billeaud, J. (June 12, 2025). Protesters clash with security outside Tucson, Arizona, ICE office. Associated Press. Unclassified. Accessed on June 12, 2025, national news organization. https://apnews.com/live/donald-trump-news-updates-6-12-2025#00000197-6561-d663-a5f7-7df11b540000.

[x] (U) Putman, J. (9 Jun 2025). Officers hit with fireworks, cruisers pelted with rocks as L.A. protests escalate. Police1. https://www.police1.com/federal-law-enforcement/officers-hit-with-fireworks-cruisers-pelted-with-rocks-as-l-a-protests-escalate. Unclassified. Accessed on 13 June 2025, regional news organization.

[xi] (U//FOUO//LES) NYPD SENTRY (June 12, 2025). "SENTRY - Los Angeles, CA - Protests turned violent - civil unrest." (e-mail).

[xii] (U//FOUO) ICE Protestors Using Drones (June 12, 2025). (e-mail).

[xiii] (U) Kurzweil, T. (June 12, 2025). Protestors attempt to disturb ICE agents at Los Angeles-area hotels. KTLA5. Unclassified. Accessed on June 12, 2025, regional news organization. https://ktla.com/news/local-news/protesters-attempt-to-disturb-ice-agents-at-los-angeles-area-hotels/.

[xiv] (U) Gomez, C. (June 12, 2025). Protesters gather outside SoCal hotels, police can't confirm if ICE agents are staying there. ABC 7. Unclassified. Accessed on June 12, 2025, national news organization. https://abc7.com/live-updates/tensions-flare-downtown-la-anti-ice-protesters-clash-agents-live-updates/16692645/entry/16728724/?ex_cid=TA_KABC_FB&utm_campaign=trueAnthem%3A+New+Content+%28Feed%29&utm_medium=trueAnthem&utm_source=facebook.

[xv] (U//FOUO//LES) DHS HSI, "Officer Safety: Allegations of Improvised Explosive Devices Placed at ICE Field Offices", Tip Line Report (June 11, 2025): 1-4.

[xvi] (U) Putman, J. (9 Jun 2025). Officers hit with fireworks, cruisers pelted with rocks as L.A. protests escalate. Police1. Unclassified. Accessed on 13 June 2025, regional news organization. https://www.police1.com/federal-law-enforcement/officers-hit-with-fireworks-cruisers-pelted-with-rocks-as-l-a-protests-escalate.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

*** FOR OFFICIAL USE ONLY *** LAW ENFORCEMENT USE ONLY ***